UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| MARCEL MIAUN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 3:14-CV-222 |
| | ) | (VARLAN/GUYTON) |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636(b), Rule 72(b) of the

Federal Rules of Civil Procedure, and the Rules of this Court for a report and recommendation

regarding disposition by the District Court of Plaintiff's Motion for Summary Judgment and

supporting memorandum, filed September 25, 2014. [Docs. 12 & 13]. Also before the Court is

Defendant's Motion for Summary Judgment and Memorandum in Support [Docs. 16 & 17].

Plaintiff Marcel Miaun seeks judicial review of the decision of the Administrative Law Judge

("ALJ"), the final decision of the Defendant Carolyn W. Colvin, Acting Commissioner of Social

Security ("the Commissioner").

On August 13, 2007, Plaintiff protectively filed a Title XVI application for supplemental

security income ("SSI") with an alleged onset date of July 11, 2007. [Tr. 200-06, 219]. The

Social Security Administration initially denied Plaintiff's application on October 2, 2007. [Tr.

117-19]. Plaintiff appeared before Administrative Law Judge Joan A. Lawrence in Knoxville,

Tennessee on September 15, 2009. [Tr. 72-90]. The ALJ issued an unfavorable decision on

February 24, 2010. [Tr. 95-108]. On March 8, 2011, the Appeals Council remanded the claim

back to the ALJ for further consideration. [Tr. 109-12]. The ALJ held a second hearing on August 23, 2012. [Tr. 47-71]. The ALJ issued an unfavorable decision on January 4, 2013. [Tr. 28-46]. Plaintiff requested review of the ALJ's decision, which the Appeals Council declined on April 5, 2014. [Tr. 26-27, 1-7].

Having exhausted his administrative remedies, Plaintiff filed a complaint with this Court on May 28, 2014, seeking judicial review of the Commissioner's final decision under Section 205(g) of the Social Security Act. [Doc. 1]. The parties have filed competing dispositive motions, and this matter is now ripe for adjudication.

## I.    ALJ FINDINGS

The ALJ made the following findings:

> 1. The claimant has not engaged in substantial gainful activity since August 13, 2007, the application date (20 CFR 416.971 *et seq*.).

> 2. The claimant has the following severe impairments: residual effects of Chernobyl syndrome, seizure disorder, osteoarthritis, and anxiety disorder (20 CFR 416.920(c)).

> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

> 4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except no climbing ladders; do no more than occasional climbing of stairs, balancing, stooping, bending, crouching, crawling, or kneeling; must avoid hazards; some problems with concentration, but can concentrate for at least two hours at a time; deal with occasional changes, not frequent; requires simple or detailed work, not complex; and no work where interaction/communication would be required.

> 5. The claimant has no past relevant work (20 CFR 416.965).

2

6. The claimant was born on March 19, 1969 and was 38 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7. The claimant is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since August 13, 2007, the date the application was filed (20 CFR 416.920(g)).

[Tr. 33-40].

## II.   DISABILITY ELIGIBILITY

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act.  42 U.S.C. § 1382(a); 20 C.F.R. § 416.202.  An individual is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability. See 42 U.S.C. § 1382(a).

"Disability" is the inability "[t]o engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 1382c(a)(3)(A).  An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

3

experience, engage in any other kind of substantial gainful work which exists in the national

economy, regardless of whether such work exists in the immediate area in which he lives, or

whether a specific job vacancy exists for him, or whether he would be hired if he applied for

work. 42 U.S.C. § 1382c(a)(3)(B).

Disability is evaluated pursuant to a five-step analysis summarized as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity ("RFC") and vocational factors (age, education, skills, etc.), he is not disabled.

Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. §

404.1520). Plaintiff bears the burden of proof at the first four steps. Walters, 127 F.3d at 529.

The burden shifts to the Commissioner at step five. Id. At the fifth step, the Commissioner must

prove that there is work available in the national economy that the claimant could perform. Her

v. Comm'r of Soc. Sec., 203 F.3d 388, 391 (6th Cir. 1999) (citing Bowen v. Yuckert, 482 U.S.

137, 146 (1987)).

## III.  STANDARD OF REVIEW

When reviewing the Commissioner's determination of whether an individual is disabled

4

pursuant to 42 U.S.C. § 405(g), the Court is limited to determining "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." Blakley v. Comm'r of Soc. Sec., 581 F.3d 399, 405 (6th Cir. 2009) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)). If the ALJ applied the correct legal standards and his findings are supported by substantial evidence in the record, his decision is conclusive and must be affirmed. Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004); 42 U.S.C. § 405(g). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quotation omitted); see also Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison v. NLRB, 305 U.S. 197, 229 (1938)).

It is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ, or whether the reviewing judge may have decided the case differently. Crisp v. Sec'y of Health & Human Servs., 790 F.2d 450, 453 n.4 (6th Cir. 1986). The substantial evidence standard is intended to create a "'zone of choice' within which the Commissioner can act, without the fear of court interference." Buxton v. Halter, 246 F.3d 762, 773 (6th Cir. 2001) (quoting Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, the Court will not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

In addition to reviewing the ALJ's findings to determine whether they were supported by substantial evidence, the Court also reviews the ALJ's decision to determine whether it was reached through application of the correct legal standards and in accordance with the procedure mandated by the regulations and rulings promulgated by the Commissioner. See Wilson v.

5

Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004). The Court may, however, decline to reverse and remand the Commissioner's determination if it finds that the ALJ's procedural errors were harmless.

An ALJ's violation of the Social Security Administration's procedural rules is harmless and will not result in reversible error "absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the [ALJ]'s procedural lapses." Wilson, 378 F.3d at 546-47. Thus, an ALJ's procedural error is harmless if his ultimate decision was supported by substantial evidence *and* the error did not deprive the claimant of an important benefit or safeguard. See Id. at 547.

On review, Plaintiff bears the burden of proving his entitlement to benefits. Boyes v. Sec'y. of Health & Human Servs., 46 F.3d 510, 512 (6th Cir. 1994) (citing Halsey v. Richardson, 441 F.2d 1230 (6th Cir. 1971)).

## IV.    EVIDENCE

### A.    *Medical Evidence*

Plaintiff protectively filed an application for supplemental security income on August 13, 2007, with an alleged onset date of July 11, 2007. [Tr. 200-06, 219]. Plaintiff was 38 years old at the time of his application. [Tr. 200]. Plaintiff completed tenth grade and does not have any past relevant work experience. [Tr. 39, 217]. Plaintiff is a refugee from Moldova, where he served in the Soviet Army. [Tr. 311]. For two years he was stationed at the Chernobyl Nuclear Power Plant in the Ukraine, and Plaintiff alleges that he suffers from weakness and sickness due to radiation exposure at Chernobyl. [Tr. 76-78, 214, 311]. He states that his conditions of Chernobyl syndrome, liver, and stomach problems inhibit his ability to work. [Tr. 214].

Plaintiff sought treatment in Moldova for radiation poisoning, and in 1995, he was

6

diagnosed with "vascular encephalopathy of degree II of the mixed genesis (ionized radiation, vertebrogenis) with the vegetal vascular disorders. Chronic viral hepatitis B with chronic acalculus cholecystitis." [Tr. 311]. Plaintiff was subsequently diagnosed with subacute strumitis and problems with his spleen. [Tr. 311-12]. He was hospitalized in Moldova several times between 1995 and 2007 for treatment regarding these various ailments. [Id.]. His final diagnosis from the Sanatorium and Recovery Association Polyclinic of Moldova was vascular encephalopathy, active chronic Hepatitis B, chronic cathral bronchitis in remission, autoimmune thyroiditis with moderate hypothyroidism, primitive osteoarthritis, and chronic prostatitis in remission. [Tr. 313-14]. Plaintiff was noted as requiring permanent treatment. [Tr. 314].

Plaintiff was processed for entry into the United States through Bridge Refugee and Sponsorship Services with an allocation date of May 16, 2007. [Tr. 303-05]. He arrived in the United States on July 11, 2007. [Tr. 333]. Plaintiff was evaluated at the Knox County Health Department on August 2, 2007. [Tr. 332-34]. His conditions and medical history included hepatitis B, varicella, chronic bronchitis, headaches, and thyroid disease. [Tr. 333-34].

Dr. Robert A. Blaine conducted an examination at the behest of the Tennessee Disability Determination Services on September 17, 2007. [Tr. 335-39]. Dr. Blaine noted Plaintiff's history of Chernobyl syndrome, chronic bronchitis, hypertension, hepatitis, and tuberculosis. [Tr. 335-36]. He diagnosed Plaintiff with Chernobyl syndrome, status post arm fracture, and low back pain. [Tr. 338]. Dr. Blaine noted that Plaintiff spoke no English and that communication was difficult even with an interpreter. [Tr. 335, 338]. Despite the language barrier, Dr. Blaine found that Plaintiff gave "full effort to the examination." [Tr. 337]. Dr. Blaine's final assessment stated that "[i]t is difficult to assess this patient's abilities because of the language barrier; however, it appears that he could stand or walk 2 to 4 hours in an 8-hour day with reasonable rest

7

breaks." [Tr. 338]. He found Plaintiff could lift up to 20 pounds frequently and 30 pounds occasionally. [Id.].

Dr. James Gregory submitted a physical RFC assessment on October 1, 2007. [T. 340-47]. He found Plaintiff could lift up to 20 pounds occasionally, 10 pounds frequently, stand or walk for 2 hours out of an 8-hour workday, and sit for up to 6 hours. [Tr. 341]. Dr. Gregory noted that there was a treating source statement on file and that his findings did not significantly differ from Plaintiff's treating physician. [Tr. 346].

Plaintiff sought treatment at the Healthcare Center at Fountain City in November 2007 for fatigue, dizziness, abdominal pain, nausea and vomiting, dysuria, headaches, and syncope. [Tr. 349]. He was referred to neurologist Dr. Sam Kabbani of East Tennessee Neurology Clinic. [Id.]. Dr. Kabbani began treating Plaintiff for headaches and syncope on November 13, 2007. [Tr. 357]. He noted that Plaintiff reported "get[ing] dizzy, zoning out, sometimes dropping things, poor sleep and wakes up frequently." [Id.]. He diagnosed Plaintiff with "[c]losed head injury with potential radiation exposure" and a seizure disorder. [Tr. 358]. Dr. Kabbani noted that an "[e]xtended EEG showed sharp forms, high voltage activity and slowing." [Id.]. He prescribed Keppra, referred Plaintiff for a cranial MRI, and noted he was not capable of driving. [Id.].

The MRI was performed on November 20, 2007 and revealed "[s]mall mucus retention cyst in the middle right maxillary sinus and possibly the left maxillary sinus but otherwise normal MRI of the brain." [Tr. 359]. Plaintiff continued to see Dr. Kabbani every few months and on March 5, 2008, Dr. Kabbani noted that Plaintiff had lost seven pounds and was '[n]o longer able to work." [Tr. 355]. He advised trying the Keppra in a different frequency and adding Depakote. [Id.].

8

Dr. Reeta Misra submitted a physical RFC assessment on March 18, 2008. [Tr. 361-66]. Dr. Misra found Plaintiff could lift up to 20 pounds occasionally, 10 pounds frequently, stand or walk for 2 hours out of an 8-hour workday, and sit for up to 6 hours. [Tr. 362]. Dr. Misra noted Plaintiff's abnormal EEG "with spikes suggestive of seizure [disorder]" but found that Plaintiff "should stay stable with proper management[.]" [Tr. 366].

Plaintiff sought treatment at Urology Consultants of Knoxville on March 31, 2008 for problems with urination and back pain. [Tr. 373]. An abdominal CT was performed, which was negative "of the abdomen and pelvis with the renal stone protocol" and "no renal or ureteral calculi." [Tr. 380]. Dr. Brian Parker diagnosed benign prostatic hyperplasia with obstruction, possible prostatitis, and back pain. [Tr. 374]. He prescribed Flomax for one month, but Plaintiff reported no change in his symptoms. [Id., Tr. 372]. Dr. Parker recommended a Direct Visual Internal Urethrotomy, which was performed on June 23, 2008. [Tr. 372, 370]. By July 17, 2008, Plaintiff reported that he had improved, was prescribed Bactrim and Pyridium, and scheduled for a follow up exam in three months. [Tr. 368].

By July 28, 2008, Plaintiff followed up with Dr. Kabbani regarding his seizure disorder and headaches, reporting significant headaches but that "Tramadol has been helpful in the short-term." [Tr. 385]. Dr. Kabbani also expressed concern that Plaintiff was not able to understand when Dr. Kabbani's office called with lab results and the interpreter stated he would be willing to assist in that regard. [Id.]. On October 28, 2008, Dr. Kabbani noted that Plaintiff erroneously ceased taking his Depakote prescription due to a communication barrier. [Tr. 435]. On January 20, 2009, Plaintiff returned to Dr. Kabbani, reporting that he was still having seizures. [Tr. 434]. Dr. Kabbani discontinued Depakote and started Plaintiff on Carbatrol, stating he would check Plaintiff's medication levels and adjust accordingly. [Id.]. On April 16, 2009, Plaintiff reported

9

that he "falls on the floor at least once a week if not more." [Tr. 433]. Plaintiff stated that "he just does not have any improvement to seizures or headache." [Id.]. Dr. Kabbani ordered lab work to check Plaintiff's medication levels, changed his Tramadol prescription to Darvocet, increased Lyrica, continued Keppra, and began tapering off his Carbatrol. [Id.]. By July 9, 2009, Dr. Kabbani noted that tapering the Carbatrol seemed to "help somewhat[,]" but that Plaintiff continued to "fall at least once per week." [Tr. 432]. Dr. Kabbani stated that Plaintiff "had been exposed to notable incidents and that is why we think seizures and headaches have started." [Id.] (capitalized in the original).

On November 11, 2009, Dr. Kabbani submitted a RFC questionnaire stating that Plaintiff had epilepsy with "complex partial seizure with secondary generalization." [Tr. 449-52]. He reported that Plaintiff's last three seizures occurred on the first week of November, last week of October, and the third week of October, his seizures typically lasted between ten to thirty minutes, he had no warning of an impending seizure, and was unable to take safety precautions when he felt a seizure commence. [Tr. 449]. Dr. Kabbani reported that Plaintiff's seizures affected his daily activities by impairing his ability to concentrate and complete tasks and that he had a history of injury and incontinence during his seizures. [Tr. 450]. Dr. Kabbani noted that Plaintiff was compliant in taking his medication and that he was incapable of performing "even 'low stress' jobs[.]" [Tr. 450, 452].

On November 28, 2009, Gerald Winkler completed a Medical Interrogatory Physical Impairment assessment. [Tr. 453-55]. He found that Plaintiff did not meet the criteria for Listing 11.02 because "[t]he frequency of seizures is not clearly and consistently documented" and "compliance with medication is not clearly established." [Tr. 454]. He assigned several exertional limitations, including no climbing of ladders, no work at unprotected heights, no work

10

around fire, no driving, no work around water, and "[n]o work where an abrupt loss of consciousness would expose the claimant or those around him to risk of injury." [Tr. 455].

Plaintiff continued to seek treatment from Healthcare Center at Fountain City, subsequently renamed the Families First Medical Group, from 2007 through 2010. [Tr. 457-58, 492-516]. Plaintiff was consistently diagnosed with seizures, arthritis, Gastroesophageal reflux disease, chronic abdominal pain, and lower back pain. [See id.]. A CT scan of his abdomen was performed on April 7, 2010 with normal results. [Tr. 516].

On August 22, 2011, Plaintiff was evaluated by Dr. Raymond Azbell. [Tr. 483-91]. Dr. Azbell noted Plaintiff had reduced range of motion in his cervical spine, lumbar spine, shoulder, wrists, hips, and ankles with normal gait and station. [Tr. 484-85]. Dr. Azbell diagnosed seizure disorder, chronic headaches, hepatitis and chronic liver disease, severe osteoarthritis, and gastrointestinal issues. [Tr. 485]. He found that Plaintiff could occasionally lift 10 to 20 pounds, could sit for up to 1 hour without interruption, stand and walk for up to 10 minutes without interruption, sit for up to 6 hours in an 8-hour workday, and stand or walk for up to 1 hour in an 8-hour workday. [Tr. 486-87]. Dr. Azbell assessed that Plaintiff could never conduct most postural activities, except he could occasionally climb stairs or ramps and balance. [Tr. 488].

Dr. Phillip K. Axtell conducted a psychological evaluation on February 9, 2012. [Tr. 525-32]. He diagnosed Plaintiff with anxiety order and depressive symptoms, rule out malingering, epilepsy, chronic liver disease, and osteoarthritis. [Tr. 528]. He was unable to determine Plaintiff's Global Assessment of Functioning ("GAF") "due to possible malingering." [Id.]. He found that Plaintiff was mildly limited in his social interactions and ability to interact with supervisors and co-workers. [Tr. 531].

Plaintiff continued to see Dr. Kabbani from 2010 through 2013. In April of 2010,

11

Plaintiff reported his symptoms were much improved. [Tr. 477]. However, on August 11, 2010, Plaintiff's symptoms worsened because he ran out of medication and, due to a communication issue, failed to call for a refill. [Tr. 476]. Plaintiff also forgot and missed an appointment due to a "lot of personal stressors[.]" [Id.]. On July 11, 2011, Dr. Kabbani reported that Plaintiff's medication had "seemed helpful but have lessened recently[.]" [Tr. 548]. Dr. Kabbani noted that Plaintiff was following his treatment plan from April 2011 and that his new interpreter was a pharmacy technician. [Id.]. On July 18, 2012, Plaintiff reported heavy seizures approximately every one and half weeks and that his medications made him vomit. [Tr. 563]. Dr. Kabbani discussed a possible implant with Plaintiff, which he declined "due to 'family member died from it." [Tr. 565]. Plaintiff reported on July 31, 2012 that he was still having seizures, one large and one small the previous day, which included jerking and kicking. [Id.]. The Plaintiff continued to report seizures and difficulties tolerating medication in October of 2012. [Tr. 567]. On January 17, 2013, Plaintiff reported that "his seizures are worse taking Vimpat, Lyrica and Keppra[,]" and Dr. Kabbani noted no change in Plaintiff's condition. [Tr. 569].

### B. Other Evidence

The ALJ issued an unfavorable decision on January 4, 2013. [Tr. 28-46]. She found that none of Plaintiff's impairments satisfied the Listings and specifically walked through the criteria for mental impairments found in 12.00(C). [Tr. 34-35]. In regards to Plaintiff's physical impairments, the ALJ found that "the claimant does not have the gravity of symptoms nor medical documentation in order to establish an impairment of listing level severity." [Tr. 34].

In determining the Plaintiff's RFC, the ALJ considered Plaintiff's medical history and gave Dr. Kabbani's opinion substantial weight, finding his opinion "credible and consistent with the residual functional capacity as to the claimant's avoidance of work hazards and attention and

12

work problems." [Tr. 38]. Mr. Winkler was also granted substantial weight, Dr. Blaine and Dr. Azbell were granted some weight, and the ALJ found Dr. Axtell credible and "accept[ed] her conclusion insofar as they are consistent with the residual functional capacity assigned herein and reflective of no more than moderate impairments in any of the domains with respect to the claimant's ability to perform work-related activities." [Tr. 38-39].

The ALJ found that there were jobs of significant numbers in the national economy which Plaintiff could perform, and adopted the testimony of Vocational Expert ("VE"), Jane L. Hall, that an individual with Plaintiff's RFC could perform such occupations as hand packer/packager, hand laborer, and machine operator. [See Tr. 40, 60-63].

## V.    POSITIONS OF THE PARTIES

The Plaintiff argues that the ALJ erred at step three and four of the disability analysis. Specifically, Plaintiff argues that the ALJ's failure to consider whether Plaintiff's seizure disorder met the criteria of Listing 11.02 *Epilepsy* was harmful error. Further, Plaintiff contends that the ALJ violated the treating physician rule by failing to grant Dr. Kabbani controlling weight or provide good reasons for the weight assigned.

The Commissioner responds that the ALJ's finding that Plaintiff's physical impairments did not satisfy the Listings is supported by substantial evidence. The Commissioner further argues that the ALJ properly weighed the medical evidence in determining Plaintiff's RFC and correctly applied agency procedure in considering Dr. Kabbani's opinion. Finally, the Commissioner argues that substantial evidence supports the ALJ's holding at step five that Plaintiff was capable of performing other work that existed in significant numbers in the national economy.

13

## VI.    ANALYSIS

The Court will address each of the issues presented by the Plaintiff in turn.

### A.  The Listings

The Court finds that the ALJ erred by not addressing whether Plaintiff's epilepsy qualified as a listed impairment.   Generally, a claimant can establish disability by demonstrating all of the medical findings listed for an impairment.  20 C.F.R. § 404.1525(c)(3).  "If a claimant does not have one of the findings, however, [he or] she can present evidence of some medical equivalent to that finding." Bailey v. Comm. Soc. Sec., 413 F. App'x 853, 854 (6th Cir. Mar. 11, 2011) (citing 20 C.F.R. §§ 404.1525 & 404.1526).  To demonstrate such a medical equivalent, the claimant must present "medical findings equal in severity to *all* the criteria for the one most similar listed impairment."  Sullivan v. Zebley, 493 U.S. 521, 531 (1990) (emphasis in original). The claimant has the burden of establishing that his impairment meets or equals a listed impairment.  Walters, 127 F.3d at 529.

Once a plaintiff proves the existence of a severe impairment, the impairment must be analyzed under the Listings set forth in 20 C.F.R. § 404, Subpart P, Appendix 1.  See Reynolds v. Comm'r of Soc. Sec., 424 F. App'x 411, 415 (6th Cir. 2011) (finding that "[a]n administrative law judge must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.").   In Reynolds, the court found that the ALJ erred by failing to analyze the Plaintiff's physical impairments because the ALJ "skipped an entire step of the necessary analysis.  He was required to assess whether [Plaintiff] met or equaled a Listed Impairment . . . but did not do so."  Id. at 415.

14

Such an error is generally considered harmful. In <u>Reynolds</u>, the Sixth Circuit explained that "[t]he ALJ's error was not harmless, for the regulations indicate that if a person is found to meet a Listed Impairment, they are disabled within the meaning of the regulations and are entitled to benefits; no more analysis is necessary." <u>Id</u>. at 416. (citing 20 C.F.R. § 404.1520(a)(4)(iii)). Without sufficient evaluation of all severe impairments under the Listings, it is impossible to determine whether the ALJ's decision was based on substantial evidence. <u>See id</u>. (citing <u>Clifton v. Chater</u>, 79 F.3d 1007, 1009 (10th Cir. 1996)).

However, such an error will be found harmless where the ALJ has adequately considered the severe impairments elsewhere. <u>See Bledsoe v. Barnhart</u>, 165 F. App'x 408, 411 (6th Cir. 2006) (finding that "[t]he ALJ did not err by not spelling out every consideration that went into the step three determination . . . [t]he ALJ described evidence pertaining to all impairments, both severe and non-severe . . . five pages earlier in his opinion and made factual findings. The ALJ explicitly stated that he considered the combination of all impairments even though he did not spell out every fact a second time under the step three analysis.").

Here, the ALJ found that Plaintiff's severe mental impairments included "residual effects of Chernobyl syndrome, seizure disorder, osteoarthritis, and anxiety disorder." [33]. The ALJ found that Plaintiff's mental impairments did not satisfy 20 C.F.R. § 404, Subpart P, App. 1, and specifically considered Listing 12.00(C). [Tr. 34]. The ALJ addressed the four broad functional areas of activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation. [See Tr. 34-35]. Yet in regard to Plaintiff's physical impairments, the ALJ summarily found that none of them met a listed impairment, stating merely that "the claimant does not have the gravity of symptoms nor medical documentation in order to establish an impairment of listing level severity." [Tr. 34].

15

The Court must find that the ALJ erred at step three of the disability analysis. See Reynolds, 424 F. App'x at 415-16 (finding that the ALJ was required to consider the severe impairments identified at step two under the Listings); Oddo v. Astrue, No. 5:12-CV-00532, 2012 WL 7017622, at *5 (N.D. Ohio Dec. 10, 2012) (citation omitted) (explaining "that finding an impairment is 'severe' at Step Two does not mandate a *per se* finding that such an impairment imposes a significant work related limitation under [the Listings, but] the ALJ should, at least, discuss the distinction between the two."). Because epilepsy is a listed impairment, the Court concurs with Plaintiff that the ALJ should have specifically considered whether his seizure disorder satisfied Listing 11.02.

Under Listing 11.02 *Epilepsy—convulsive epilepsy*, (grand mal or psychomotor), seizures must be "documented by detailed description of a typical seizure pattern, including all associated phenomena[.]" 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.02. 11.02 seizures must occur more than once a month and "in spite of at least 3 months of prescribed treatment[.]" Id. The Listings instruct that the "degree of impairment will be determined according to type, frequency, duration, and sequelae of seizures . . . Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available." Id. at 11.00(A). The Listings also make clear that 11.02 will only apply "if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment. Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy." Id. The Listings instruct that "[e]valuation of the severity of the impairment must include consideration of the serum drug levels . . . [and w]here adequate seizure control is obtained only with unusually large doses, the possibility of impairment resulting from the side effects of this medication must be also

16

assessed." Id.

The Court acknowledges that the ALJ considered Plaintiff's seizure disorder at step four and incorporated her previous discussion of Plaintiff's medical history from her original decision, [Tr. 36, 100-04], but finds that such consideration was inadequate to satisfy her duty at step three. The ALJ did not specify what Listings she considered regarding Plaintiff's physical impairments and did not apply any of the 11.02 criteria to his seizure disorder. When she did address Plaintiff's seizure disorder at step four, she relied solely on two treatment records from 2010 showing Plaintiff's condition had improved and a single examination report from 2011 reflecting that Plaintiff "walked in and out of the appointment without issue[.]" [See Tr. 37, 476-77, 550-51]. Yet the ALJ did not address Plaintiff's specific type of epilepsy (whether his seizures were gran mal or psychomotor), their frequency and duration, Dr. Kabbani's extensive treatment records documenting Plaintiff's seizure pattern, Plaintiff's history of falling and injuring himself during seizures, Plaintiff's medication levels, or Dr. Kabbani's RFC assessment specifically describing the frequency of Plaintiff's seizures and seizure pattern. [See Tr. 433-35, 449, 548, 542-51, 563-70]. The ALJ also apparently did not consider the evidence showing that Plaintiff's symptoms continued and even worsened despite his compliance with medication, including Dr. Kabbani's RFC assessment and treatment notes reporting that Plaintiff was generally compliant with his treatment plans. [See Tr. 449, 548, 563, 567].

The Court must find that the ALJ did not give adequate consideration to the record as a whole. See Howard v. Barnhart, 376 F.3d 551, 554 (6th Cir. 2004) (finding error "where the administrative law judge was found to have selectively considered the evidence in denying benefits"). Regardless of Plaintiff's noncompliance and brief improvement in 2010, Dr. Kabbani's treatment records reflect that Plaintiff's seizures continued, varying in severity, in

17

2011 and 2012 despite his general compliance with his medication and treatment plans. [See Tr. 548] (noting that Plaintiff's medication had "seemed helpful but have lessened recently"); [See Tr. 563-67] (records from 2012 showing Plaintiff's continued seizures despite taking his medications as prescribed). These records should be considered in conjunction with any other treatment notes reflecting noncompliance or missed appointments in order to examine the full landscape of Plaintiff's impairment and treatment history. To pick and choose from the administrative record, relying on some reports and ignoring others, violates agency procedure.

This error was not harmless. Even if the ALJ is correct that Plaintiff was noncompliant or that his conditions had improved, without a sufficient analysis of his impairments, the Court cannot determine if the ALJ's decision was based on substantial evidence. See Siuta v. Comm'r of Soc. Sec., No. 05-CV-72858-DT, 2009 WL 275732, at *3 (E.D. Mich. Feb. 5, 2009) (explaining that the ALJ's failure to specifically state what listed impairments he considered was not harmless error because "the Court could not determine if the ALJ appropriately analyzed Plaintiff's claim of disability at step 3 . . . [and] the Court was unable to verify that the ALJ's analysis and findings were supported by substantial evidence."); see also Draper ex rel. R.O. v. Astrue, No. 3:11CV2287, 2012 WL 5385056, at *9-10 (N.D. Ohio Oct. 12, 2012) (citation omitted) ("failure to explain why Claimant's impairments did not meet or equal a Listing is not harmless error because, if Claimant's impairments met or equaled [a listing], she is disabled within the meaning of the regulations"). In order to facilitate meaningful review, the ALJ should identify the applicable listed impairments and consider the record as a whole in determining whether Plaintiff satisfied the 11.02 criteria. The record contains specific descriptions of Plaintiff's seizure pattern, [see Tr. 449], and the frequency and severity of his seizures are documented throughout the record. [See Tr. 433-35, 449, 548, 542-51, 563-70].

18

The ALJ also did not pursue an investigation into certain 11.02 criteria. Dr. Kabbani discussed checking Plaintiff's medication levels, and proper consideration of Listing 11.02 warrants investigation into Plaintiff's serum drug levels. See 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.00(A). An ALJ has an investigatory duty to fully consider the record and should "re-contact a treating physician only when the information received is inadequate to reach a determination on claimant's disability status[.]" Poe v. Comm'r of Soc. Sec., 342 Fed. App'x. 149, 156 n. 3 (6th Cir. 2009); see also 20 C.F.R. § 404.1520b(c) ("If the evidence is consistent but we have insufficient evidence to determine whether you are disabled[,] the ALJ may "recontact your treating physician[,]" "request additional existing records[,]" "ask you to undergo a consultative examination at our expense[,]" or "ask you or others for more information."). If Plaintiff's drug levels were not included in the administrative record, then the ALJ could have exercised her investigatory abilities as necessary.

Without identifying the listed impairments the ALJ considered and providing a sufficient analysis as to why Plaintiff's seizure disorder does or does not satisfy 11.02, the Court's hands are tied and consideration can go no further. The Court cannot and will not review a case *de novo*. See Fury v. Comm'r of Soc. Sec., No. 5:11CV1660, 2012 WL 4475661, at *3 (N.D. Ohio Sept. 26, 2012) (finding that "to apply the facts of this case to [the Listings] for the *first time* and conclude that it does not apply [] would be a de novo review. As such, this Court is constrained from considering the argument.") (emphasis in the original). The Court finds that the ALJ erred at step three by not specifically considering Listing 11.02. Such an error warrants remand.

**B.      The Treating Physician Rule**

The Plaintiff argues that the ALJ's RFC analysis violates the treating physician rule. The Court concurs. An ALJ will consider "every medical opinion" received and will give controlling

19

weight to the opinions of treating physicians. See 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) ("[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."). Where an opinion does not garner controlling weight, the appropriate weight to be given an opinion will be determined based upon the following factors: length of treatment, frequency of examination, nature and extent of the treatment relationship, amount of relevant evidence that supports the opinion, the opinion's consistency with the record as a whole, the specialization of the source, and other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2-6) and 416.927(c)(2-6).

When an ALJ does not give a treating physician's opinion controlling weight, the ALJ must give "good reasons" for the weight given to a treating source's opinion in the decision. 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). A decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for the weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (1996).

Nonetheless, although a treating physician's diagnosis is entitled to great weight, "the ultimate decision of disability rests with the administrative law judge." Walker v. Sec'y of Health & Human Servs., 980 F.2d 1066, 1070 (6th Cir. 1992) (citing King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984). An ALJ does not measure medical evidence in a vacuum, but rather considers physician opinions in conjunction with the record as a whole. See 20 C.F.R. § 404.1527(b) (explaining that in considering medical opinions, the SSA "will always consider the

20

medical opinions in your case record together with the rest of the relevant evidence we receive.").  The agency will consider such evidence as "statements or reports from you, your treating or nontreating source, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work."  20 C.F.R. § 404.1529(a).

Therefore, even if the ALJ fails to properly apply the treating physician rule, if substantial evidence exists to support the ALJ's determination of the claimant's RFC based on other relevant evidence, such an error will be found harmless.  See Francis v. Comm'r Soc. Sec. Admin., 414 F. App'x 802, 804-05 (6th Cir. 2011) (holding that the regulations require only "good reasons" for the weight assigned a treating physician, "not an exhaustive factor-by-factor analysis," and finding that the ALJ's failure to consider the factors set forth in 20 C.F.R. § 404.1527(d)(2) was harmless error because "the ALJ cited the opinion's inconsistency with the objective medical evidence, [Plaintiff's] conservative treatment and daily activities, and the assessments of [Plaintiff's] other physicians.  Procedurally, the regulations require no more."); Friend v. Comm'r of Soc. Sec., 375 F. App'x 543, 551 (6th Cir. 2010) (explaining that the treating physician rule "is not a procrustean bed, requiring an arbitrary conformity at all times.  If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.").

Here, the ALJ granted Dr. Kabbani's opinion substantial weight, finding his opinion "credible and consistent with the residual functional capacity as to the claimant's avoidance of work hazards and attention and work problems." [Tr. 38].  The ALJ considered portions of Dr. Kabbani's treatment records, as discussed above, and briefly cited his RFC assessment.  [See Tr.

21

37-38] (taking issue with Dr. Kabbani's opinion that Plaintiff was compliant in his medication, noting an August 2010 examination that "reveals that claimant ran out of medications and failed to call for more . . . The fact that the claimant failed to call for more medications suggests that the symptoms may not have been as serious as has been alleged"). However, the ALJ's opinion is absent an explanation as to why Dr. Kabbani's opinion was not granted controlling weight. The ALJ never addressed the treating physician rule or provided "good reasons" for the weight assigned to Dr. Kabbani. See Francis, 414 F. App'x at 804-05. The ALJ merely stated that Dr. Kabbani's opinion was credible in regards to work hazards and problems without sufficiently explaining its deficiencies. [See Tr. 38].

Not only did the ALJ fail to provide "good reasons" for assigning Dr. Kabbani substantial weight, she apparently did not consider the factors set forth in 20 C.F.R. §§ 404.1527(c)(2-6) and 416.927(c)(2-6). The ALJ's opinion is absent any consideration of the length of treatment, frequency of examination, the nature and extent of the treatment relationship, the specialization of the source, the supportability, or the consistency of his opinion with the record as a whole. See id. Although the ALJ incorporated the medical history contained in her original opinion, [Tr. 36, 100-04], any discussion of Plaintiff's treatment records with Dr. Kabbani is cursory. In both of her opinions, the ALJ did not address Dr. Kabbani's numerous examination reports which documented Plaintiff's chronic seizures, lack of improvement, compliance with medication and treatment plans, falls and injuries as result of his seizures, chronic headaches, seizure patterns, or documentation of Plaintiff's resulting pain, anxiety, and lack of sleep. [See Tr. 354-60, 384-85, 431-44, 449, 548, 542-51, 563-70]. However, the ALJ did discuss three examination reports that show brief improvement, a lack of compliance in 2010, and a normal gait and station in April of 2011. [See Tr. 37-38]. The Court notes that the record contains

22

approximately forty pages of treatment records from Dr. Kabbani, spanning from 2007 through 2013. [See Tr. 354-60, 384-85, 431-44, 449, 475-78, 542-51, 563-70]. The vast majority of these records went unmentioned by the ALJ. The ALJ also did not address Dr. Kabbani's functional assessment, largely ignoring his opinion regarding Plaintiff's work capabilities and only discussing his compliance with medication. [Tr. 38]. The Court finds such blanket, brief, and inconsistent consideration inadequate to satisfy 20 C.F.R. §§ 404.1527(c)(2-6) and 416.927(c)(2-6).

The ALJ treated Dr. Kabbani's opinion in the same manner as non-treating and non-medical sources, without acknowledging the treating physician rule or explaining why Dr. Kabbani's opinion was not subject to controlling weight. This was in error. The purpose of the treating physician rule is to give careful consideration to physicians with extensive, firsthand knowledge of the claimant and the impairment in question. A treating physician opinion offers insight that a single examination cannot, and therefore it is due adequate consideration. See Walker, 980 F.2d at 1070 ("The reason for such a rule is clear. The treating physician has had a greater opportunity to examine and observe the patient. Further, as a result of his duty to cure the patient, the treating physician is generally more familiar with the patient's condition than are other physicians.").

The Court notes that strict compliance to the treating physician rule is not required. See Francis, 414 F. App'x at 804-05; Friend, 375 F. App'x at 551. However, an ALJ must "make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for the weight." SSR 96–2p, 1996 WL 374188, at *5. Here, the ALJ stated that Dr. Kabbani was granted substantial weight, but she failed to provide any explanation as to why the treating physician rule did not apply.

23

The Court finds that this error was not harmless. The treating physician rule is a "mandatory procedural protection[,]" and thus embodies a substantial right. Wilson, 378 F.3d at 546-47 (a procedural lapse will be held harmless "absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the [ALJ]'s procedural lapses."). Regardless of whether proper consideration of Dr. Kabbani's opinion would impact Plaintiff's outcome, denying him proper procedural protections negates a finding of substantial evidence and warrants remand.

**C. Whether Plaintiff Can Perform Jobs Available in Significant Numbers in the National Economy**

The Commissioner argues that substantial evidence supports the ALJ's finding that there were jobs in the national economy which Plaintiff could perform during the relevant timeframe. [Doc. 17 at 12-13]. The Plaintiff does not raise an argument in regards to step five of the disability analysis, but merely concludes his dispositive motion by arguing that he is "unable to perform basic job functions, is therefore unable to return to past relevant work, unable to maintain other gainful employment, and accordingly is 'disabled.' The aforementioned errors by the ALJ should not be found harmless." [Doc. 13 at 20]. Such a statement is insufficient to substantiate a colorable argument regarding the ALJ's decision at step five. See McPherson v. Kelsey, 125 F.3d 989, 995-96 (6th Cir. 1997) ("'Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.'" (quoting Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n, 59 F.3d 284, 293–94 (1st Cir. 1995)). However, the Court may address an issue *sua sponte* should it find error upon review. See Buhl v. Comm'r of Soc. Sec.,

24

12–10087. 2013 WL 878772, at *7 n.5 (E.D. Mich. Feb.13, 2013) (plaintiff's failure to raise the argument did not prevent the Court from identifying error based on its own review of the record and ruling accordingly).

The Court disagrees with the Commissioner and finds that the ALJ's decision at step five that there are jobs in the national economy in significant numbers that the Plaintiff could perform is unsupported by substantial evidence. [See Tr. 39]. The ALJ, relying on testimony by the vocational expert, found that Plaintiff could perform such occupations as hand packer/packager, hand laborer, and machine operator. [Tr. 40; see Tr. 61-63]. The ALJ assessed that Plaintiff had the RFC to perform sedentary work with additional exertional limitations and could not perform "work where interaction/communication would be required." [Tr. 35-36].

Upon review of the Dictionary of Occupational Titles ("DOT), the Court finds that none of the aforementioned occupations are consistent with the Plaintiff's RFC. Although the Court is unable to locate "hand laborer" in the DOT and is unclear as to which position the ALJ or VE relied upon when discussing "machine operator," all positions identified by the Court that fall under packager, hand packer, laborer, and machine operator require more than sedentary work. See PACKAGER, HAND, DICOT 920.587-018 (requiring "Medium Work - Exerting 20 to 50 pounds of force occasionally"); INSPECTOR AND HAND PACKAGER, DICOT 559.687-074 (requiring "Light Work - Exerting up to 20 pounds of force occasionally"); PACKAGER, MACHINE, DICOT 920.685-078 (requiring medium work); FIBERGLASS-MACHINE OPERATOR, DICOT 574.682-010 (requiring medium work); SPRAY-MACHINE OPERATOR, DICOT 574.682-014 (requiring medium work); 575.362-014 GLASS-RIBBON-MACHINE OPERATOR, DICOT 575.362-014 (requiring light work).

Not only do these positions require more than sedentary work, the Court has yet to find

25

an occupation that will accommodate a restriction "where interaction/communication" would not be required. [Tr. 36]; see DICOT 920.587-018; DICOT 559.687-074; 920.685-078; 574.682-010; 574.682-014; 575.362-014 (all positions requiring some communication skills). The lowest communication skill that the Court has identified in any of the relevant positions requires that the worker be able to "[s]peak simple sentences, using normal word order, and present and past tenses." DICOT 920.587-018, 574.682-010, & 574.682-014. The ALJ specifically stated that the Plaintiff could perform "no work where interaction/communication would be required." [Tr. 36]. This restriction is inconsistent with any of the occupations identified by the VE or relied on by the ALJ.

Accordingly, the ALJ shall reevaluate whether there are jobs available in significant numbers in the national economy in which Plaintiff can perform, pursuant to Plaintiff's age, education, work experience, and reassessed RFC.

## VII.    CONCLUSION

Based upon the foregoing, it is hereby **RECOMMENDED**[1] that Plaintiff's Motion for Summary Judgment, **[Doc. 12],** be **GRANTED,** and that the Commissioner's Motion for Summary Judgment, **[Doc. 16],** be **DENIED.**

Accordingly, the Court **RECOMMENDS** that this case be remanded and:

- The ALJ shall consider whether Plaintiff's epilepsy qualifies as a listed impairment under 20 CFR § 404, Subpt. P, App. 1;

- The ALJ shall reassess Plaintiff's RFC pursuant to the treating physician rule. Specifically, the ALJ shall provide sufficient explanation of the weight assigned to Dr. Kabbani, applying the factors set forth in 20 C.F.R. §§ 404.1527(c)(2-6) and 416.927(c)(2-6);

- Once the ALJ has properly conducted her analysis at step three and four, she shall reevaluate whether there are jobs available in significant numbers in the national economy in which Plaintiff can perform pursuant to Plaintiff's age, education, work experience, and reassessed RFC.

Respectfully submitted,

Bruce Guyton

United States Magistrate Judge

---

[1] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Rule 72(b), Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985). The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive or general. Mira v. Marshall, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370 (6th Cir. 1987).